

FILED

Feb 27 2024

**CLERK, U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
BY _____ s/ RC _____ **DEPUTY**

ORDERED UNSEALED on 03/07/2024   s/ scotttweedle

~~SEALED~~
s/ scotttweedle

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>JAMES SORIANO (1),<br>RUSSELL THURSTON (2),<br><br>                    Defendants. | Case No. '24 CR0341 TWR<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 371 –<br>Conspiracy; Title 18, U.S.C., Sec.<br>201(b)(1)(A) and (C) and (b)(2)(A)<br>and (C)-Bribery; Title 26, U.S.C.,<br>Sec. 7206 – Fraud and False<br>Statements in Tax Return; Title<br>18, U.S.C. Sec. 981(a)(1)(C) and<br>Title 28, U.S.C., Sec. 2461(c) –<br>Criminal Forfeiture |

The grand jury charges that at all relevant times:

**INTRODUCTORY ALLEGATIONS**

**A. Naval Information Warfare Center-Pacific/SPAWAR**

1.    The Naval Information Warfare Center-Pacific ("NIWC PAC" or "NIWC") was a command of the United States Navy, a branch of the U.S. Department of Defense ("DoD"), which was a Department of the United States Government, headquartered in San Diego, California. Until February 13, 2019, NIWC PAC was known as SPAWAR Systems Center-Pacific ("SPAWAR"). NIWC PAC employed both civilian and Navy personnel. NIWC PAC served as a research, development, test, and evaluation facility for

MLW:cms:San Diego:2/27/24

the Navy.  Among its services, NIWC PAC provided contract administration services to various DoD commands.  Those services included providing Contracting Officer Representatives ("CORs") with technological expertise to help manage DoD contracts.

2.   NIWC PAC had a work acceptance policy that had to be followed before NIWC PAC accepted a project.  Generally work accepted at NIWC PAC had to coincide with the command's expertise and benefit the Navy.  Work for non-Navy commands required approval at the Executive Director level.

**B. The Program Support Center at the Department of Health and Human Services**

3.   The Program Support Center ("PSC") at the Department of Health and Human Services ("HHS") provided acquisition services, including assisted acquisition services, to various government agencies, including the DoD.  In an assisted acquisition, one Government agency requested assistance in the procurement process from another agency. As part of the assisted acquisition process, PSC provided a contracting officer, and assisted with determining the correct contract vehicle to use for the acquisition.  In carrying out its assisted acquisition services, PSC frequently delegated certain responsibilities for administering and monitoring its contracts to a COR. Because HHS was an outside agency, DoD would use Military Interdepartmental Purchase Requests or MIPRs to send money for contracting efforts to PSC.

4.   There were various documents that were typically used in the Government contracting process, including the Request for Proposal ("RFP"), Statement of Work ("SOW") or Performance Work Statement ("PWS"), and Independent Government Cost Estimate ("IGCE") among other documents. Certain contracts required a form called the DD-254, which

was a form that provided security classification guidance to the contractor.

5. On or about June 14, 2019, PSC sent a memorandum to DoD agencies, alerting them that "[e]ffective immediately" PSC was "terminating its assisted acquisition program for non-HHS agencies."

**The Defendants**

6. Defendant James SORIANO was a civilian employee of NIWC PAC from 2006 to 2019, where he worked as an engineer and project lead. As part of his duties at NIWC PAC SORIANO was a certified COR.

7. Defendant Russell THURSTON was the Vice President, Defense and Intelligence Solutions, and then later the Executive Vice-President, Advanced Technologies and Services Division of Company A. THURSTON rose to be third in command of Company A, under the CEO and President.

**C. Other Individuals/Entities**

8. Company A was a company with locations in Arlington, Virginia and outside of Charleston, South Carolina, among other locales. Company A purported to provide technical and consulting services in the Information Technology field.

9. Co-Conspirator-1 purported to have his own consulting business in Tampa, Florida. From approximately December 2014 to 2019, Co-Conspirator-1 purported to work for Company A as consultant. During that same time period, Co-Conspirator-1 also purported to work for two other defense contractors as a consultant. Co-Conspirator-1 served as a conduit of information between SORIANO, and THURSTON and Company A.

10. Co-Conspirator-2 worked as a Program Manager at Company A, under the direction of THURSTON.

11. Liberty Gutierrez (charged elsewhere) purported to work full time as a Senior Management Analyst at Company A from approximately

3

April 2017 through 2019. Gutierrez's job at Company A was a no-show, no work job.  While working for Company A, Gutierrez gave half of her monthly salary, or approximately $2,000 per month, in cash to SORIANO. At the same time Gutierrez was purportedly working full time for Company A, she also had full time jobs at two other defense contractors as well as a full time job at a real estate and mortgage company in San Diego, California.

12.  Individual-1 was a family member of SORIANO's who graduated from college with a Bachelor's Degree in Computer Science in May 2015.

13.  Individual-2 was a friend of SORIANO's who purported to have a small business.

**D. Official Duties**

14.  SORIANO, as a COR, had various duties and responsibilities that were laid out in various sources including Department of Defense Instruction ("DoDI") 5000.72, DoD Standard for Contracting Officer's Representative Certification; the Department of Defense COR Handbook; Federal Acquisition Regulations (FAR) 1.602, 1.604, 3.101-1, and 3.104; the Defense Federal Acquisition Regulation Supplement (DFARS) 201.602; the Defense Federal Acquisition Regulation Supplement Procedures, Guidance, and Information (DFARSPGI) 201.602-2, among other sources.  As a COR, SORIANO was supposed to be the "eyes and ears" of the Contracting Officer on the contract, and a liaison between the Government and the contractor.  DFARSPGI 201.602-2; DoD COR Handbook at 1.  During the pre-award phase, as the COR candidate, SORIANO was supposed to work with the Government contracting team in requirements development, including preparing the IGCE, PWS, RFP, and SOW, among other contract documents. *See* DoDI 5000.72; DFARSPGI 201.602-2; DoD COR Handbook 40-41, 127-147. During the pre-award phase, SORIANO was supposed to protect contractor

bid or proposal information and source selection information from unauthorized disclosure. *See* FAR 3.104-4. During the post-award phase, as the COR, SORIANO was supposed to monitor and assess contractor performance and other duties as assigned by the Contracting Officer. *See* FAR 1.604. As a COR, it was SORIANO's responsibility to protect the integrity of the acquisition process by maintaining fairness in the Government's treatment of all firms. *See* FAR 3.101-1; DFARSPGI 201.602-2; DoD COR Handbook 17-24.

15. In his position at NIWC PAC, SORIANO was required to file a yearly Office of Government Ethics (OGE) Form 450. During the relevant time period the OGE Form 450 required that SORIANO truthfully report gifts totaling more than $390 from any one source during the reporting period.

16. As a DoD employee, SORIANO's official duties also included those found in Department of Defense Directive 5500.07-R (Joint Ethics Regulations); 5 C.F.R. Part 2635 (Standards of Ethical Conduct for Employees of the Executive Branch); 5 C.F.R. Part 3601 (Supplemental Standards of Ethical Conduct for Employees of the Department of Defense); and Executive Order 12674 (Principles of Ethical Conduct for Government Officers and Employees).

**E. Certain Relevant Contracts**

17. On or about September 25, 2014, PSC awarded Company A Task Order 1 (the "Task Order 1" or "UEN NC3") on the Chief Information Officer-Solutions and Partners 3 ("CIO-SP3") Government Wide Acquisition Contract ("GWAC"). The CIO-SP3 Contract was a 10-year Indefinite Delivery, Indefinite Quantity ("IDIQ") contract for IT solutions and services. Task Order 1 purported to be awarded after a competitive

procurement. SORIANO was the COR on Task Order 1. The Government ultimately obligated approximately $32,700,466.49 on Task Order 1.

18. On or about June 30, 2017, PSC awarded Company A Task Order 2 (the "Task Order 2" or "C5ISR 2.0"). Task Order 2 purported to be awarded after a competitive procurement. Task Order 2 was also a task order on the CIO-SP3 GWAC and had a ceiling of over $300,000,000. SORIANO was the COR on Task Order 2. Because it was a task order on the CIO-SP3 contract, Task Order 2 was supposed to only be used for IT solutions and services as defined by the contract vehicle. The Government ultimately obligated approximately $100,591,083.32 on Task Order 2.

## COUNT 1 – CONSPIRACY (18 U.S.C. § 371)

19. Paragraphs 1 through 18 are hereby re-alleged and incorporated by reference.

20. Beginning in or before June 2014, and continuing through at least October 2019, in the Southern District of California and elsewhere, the defendants, JAMES SORIANO, RUSSELL THURSTON, Co-Conspirator-1, Co-Conspirator-2, and Company A, knowingly conspired with each other and with others known and unknown to the Grand Jury to commit an offense against the United States, to wit:

a. being a public official, to, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept things of value, including jobs for family and friends, expensive meals and tickets to a premiere sporting event, in return for being influenced in the performance of official acts and being induced to do or omit to do acts in violation of an official duty, in violation of 18 U.S.C. §§ 201(b)(2)(A) and (C); and

6

1    b. to, directly and indirectly, corruptly give, offer, and
2  promise things of value to a public official, specifically jobs for
3  family and friends, meals, and tickets to a premiere sporting event,
4  with intent to influence such public official in the performance of
5  official acts and to induce such public official to do or omit to do
6  acts in violation of a lawful duty, in violation of 18 U.S.C. §§
7  201(b)(1)(A) and (C).

8                **MANNER AND MEANS OF THE CONSPIRACY**

9    21.  In furtherance of this conspiracy, and to accomplish its
10  objects, various conspirators at various times used the following
11  manners and means, among others:

12    a. Company A through its employees THURSTON, Co-Conspirator-2
13  and others offered and gave a stream of benefits to SORIANO, including
14  meals, jobs for SORIANO's family and friends, including Liberty
15  Gutierrez, Co-Conspirator-1, Individual-1, and Individual-2, some of
16  which required no work or very little work, and tickets to the 2018 MLB
17  All Star Game.

18    b. SORIANO sought, accepted, and received these things of value
19  from Company A, THURSTON, Co-Conspirator-2, and others, including meals,
20  jobs for SORIANO's family and friends, including Liberty Gutierrez, Co-
21  Conspirator-1, Individual-1, and Individual-2, some of which required
22  no work or very little work, and tickets to the 2018 MLB All Star Game.

23    c. In return for this stream of benefits from Company A, through
24  its employees THURSTON, Co-Conspirator-2, and others, SORIANO agreed to
25  perform official acts; to exert pressure on other officials to perform
26  official acts; and to advocate before and advise other officials, knowing
27  and intending that such advocacy and advice would form the basis for
28  their official acts; all to advance Company A's business interests with

7

1  regards   to   Department   of   Defense   contracts,   task   orders,   and

2  contracting, as questions, matters, and controversies relating to that

3  business was brought to SORIANO's attention, and as opportunities arose.

4         d. In return for this stream of benefits from Company A, through

5  its employees THURSTON, Co-Conspirator-2, and others, SORIANO agreed to

6  do or omit to do acts in violation of his official duties, to advance

7  Company A's business interests, as opportunities arose.

8         e. SORIANO would leverage various contracting mechanisms to steer

9  Department of Defense funds to Company A.  For example, SORIANO would

10 request modifications to Task Order 1 and Task Order 2, to add "projects"

11 to the task orders, thereby essentially sole sourcing work for various

12 commands to Company A without the work being competed.  SORIANO also

13 would use sole source contracting to ensure that contract work was

14 steered to Company A.

15        f. SORIANO would use task orders that purported to be for work

16 for Commander Undersea Surveillance ("CUS") to place work for other DoD

17 commands, including commands outside the Navy.

18        g. THURSTON   and   Co-Conspirator-2   would   request   that   SORIANO

19 approve projects on Company A task orders that were out of scope of the

20 CIO-SP3 contract.

21        h. SORIANO would approve projects on Company A task orders that

22 were out of scope of the CIO-SP3 contract.

23        i. THURSTON, Co-Conspirator-2, and others would draft documents

24 for PSC that described the work that they were seeking to put on the

25 task orders as IT or IT related, even where that was inaccurate or

26 incomplete.

27        j. SORIANO would suggest Company A as a defense contractor that

28 could fill the needs of various DoD commands.

8

k. SORIANO would allow THURSTON, Co-Conspirator-2 and other Company A employees to draft documentation for procurements, including competitive procurements, before they were awarded, including such documents as the SOW, PWS, RFP, and the IGCE.  As a result, Company A was able to draft the requirements for the procurement and set the price the Government expected to pay for the services under that procurement. For competitive procurements, this further allowed Company A to introduce discriminators into the requirements that ensured that they were awarded the contract or task order.

l. THURSTON, SORIANO, and other Company A employees would clear the electronic document properties on these procurement documents, to hide the fact that Company A employees, and not SORIANO, or another Government employee, were drafting the documents.

m. THURSTON would use a personal email account to send SORIANO draft procurement documents at SORIANO's personal email account.

n. SORIANO would take additional steps to ensure Company A was awarded Department of Defense contracts and task orders.  SORIANO would sit on technical evaluation panels (TEPs) or technical evaluation boards (TEBs) and would ensure that Company A received a high rating regarding their technical ability to do the contracted work.

o. After contract award, SORIANO, as the COR, would approve Company A invoices, thereby ensuring they received payment from the Government.

p. SORIANO would convey to THURSTON and Co-Conspirator-2 internal Government information regarding complaints by other contractors about Company A.

q. SORIANO would advocate on behalf of Company A, to Government customers who had complaints about Company A.

r. SORIANO would conceal from NIWC PAC much of his contracting activity, including the numerous projects on the task orders for Company A.

s. SORIANO would conceal from CUS the extent to which he was using Task Order 2 to drive work to Company A from other military commands.

t. SORIANO would alert THURSTON to suspected investigations into his contracting by NIWC PAC.

u. SORIANO would fail to disclose the gifts from Company A on his yearly required OGE form 450.

OVERT ACTS

22.  In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed.

A1.  On or about June 12, 2014, SORIANO requested that Company A give a consulting job to Co-Conspirator-1. On or about that same date THURSTON wrote another Company A employee regarding the request, "This smells like bad."

A2.  On or about June 16, 2014, SORIANO requested that Company A give Individual-1, a family member of SORIANO's, a job.

A3.  On or about July 7, 2014, SORIANO emailed documents relating to a competitive procurement from his Navy email account to his personal email account.  The documents, which were still in draft form, included a SOW and an IGCE among other documents.

A4.  On or about August 25, 2014, NITAAC released RFP C-30772-DV for competition.  The documents for that solicitation were substantially the same as the draft documents that SORIANO had previously sent his personal email account.  THURSTON forwarded the email announcing the release of the RFP for competition to other Company A employees with

10

the text, "Do not release this one on to the team." On or about September 26, 2014, as SORIANO intended, Company A was awarded Task Order 1, the resulting task order from their winning bid on RFP C-30772-DV, which ultimately had a total potential value of $38,351,179.27.

A5. On or about October 24, 2014, THURSTON met with Individual-1, a family member of SORIANO's who was still in college, in San Diego, California, to discuss employment at Company A.

A6. On or about October 24, 2014, THURSTON emailed Co-Conspirator-1, "Do you have time next week to discuss your support?"

A7. On or about October 25, 2014, THURSTON emailed SORIANO, "I meet with [Individual 1] yesterday. Seems like a great kid. We will push forward on getting him started. We should have him ready to go by 1 November if that works for you." THURSTON additionally stated, "I am meeting with [Co-Conspirator-1] early next week. Should have him started by 1 November."

A8. On or about October 25, 2014, THURSTON sent an email to another Company A employee, stating, "I will be submitting a Job Req ASAP for the Management Analyst position that we be filling in San Diego on the SSC PAC UEN and NC3 task. However I wanted to introduce you to [Individual 1]. I interviewed him this week and want to see if we can get him started 3 November." THURSTON subsequently emailed a list of bullet points for the position that he was creating for Individual-1.

A9. On or about November 13, 2014, THURSTON emailed Individual-1 that "Jim Soriano" would be his "POC" for the Company A job, and that his schedule would be "driven by Jim's demand." Notwithstanding the fact that Individual-1 was a relative of SORIANO's, and THURSTON knew that Individual-1 knew SORIANO, THURSTON wrote an email to Individual-1 via claiming that he would "make a virtual

introduction" to SORIANO.   As a result of SORIANO's specific request, and as SORIANO and THURSTON intended, Individual-1 started work at Company A on November 17, 2014, purporting to work part-time and remotely in San Diego.

A10. On or about December 2, 2014, SORIANO emailed THURSTON, "When can [Co-Conspirator-1] start?"   THURSTON replied, "ASAP.   I will push it through contracts ASAP."   On or about December 2, 2014, Co-Conspirator-1 filled out a consultant agreement with Company A, which represented that Co-Conspirator-1 was "an expert in the field of CUS UEN/NC3 Project SME Services" and promised to pay him $80/hour.

A11. On or about December 2, 2014, THURSTON instructed Individual-1, who had been given a contract charge code to bill to, but was in fact not doing any substantive work, "Please do not add any notes inside of [Company A's time keeping system] as far as the activities you are doing."

A12. On or about May 15, 2015, THURSTON emailed Individual-1 offering him full time employment at Company A.   THURSTON followed up with, "Remind me. What is your degree in?"

A13. On or about June 18, 2015, SORIANO alerted THURSTON that HHS would not let them add work they were trying to add to Task Order 1.   THURSTON replied, "Let's write a new one for over $100k. We can use the multiple tasks to create it and then we will be good. I will start drafting."

A14. On or about September 29, 2015, SORIANO emailed PSC asking if $1.2 million could be added to] Company A's Task Order 1 for "USN Data Centers."   On or about September 30, 2015, SORIANO forwarded to THURSTON an email from PSC that requested an SOW for the $1.2 million of work, with the text "FYI!!!!"   THURSTON replied, "We are on it."

A15. On or about September 30, 2015, SORIANO emailed THURSTON the IGCE for the Data Center project. THURSTON replied to SORIANO's email, "Thanks! We have submitted the numbers back to HHS." On or about September 30, 2015, SORIANO emailed PSC that Company A's proposal was, "Reviewed and acceptable." On or about that same date, and as SORIANO intended, PSC issued Modification 3 to Task Order 1, adding $1.2 million in funding for the Data Center project.

A16. On or about January 5, 2016, SORIANO emailed THURSTON asking him to help build a PWS for a contracting effort relating to Google Apps for Government. THURSTON then forwarded the chain to other Company A employees alerting them that they needed a PWS "pulled together" and that they should "Plan on putting it on the UEN/NC3 Task Order."

A17. On or about January 8, 2016, Co-Conspirator-2 emailed the draft PWS for the effort to SORIANO. The attached PWS, drafted by employees of Company A, specified the "performance requirement" for the contractor, the "performance standard" for the contractor, and the "acceptable quality level" for the contractor under the contract. On or about January 26, 2016, SORIANO forwarded the document to PSC.

A18. On or about January 26, 2016, SORIANO emailed THURSTON a CV for Individual-2, another individual SORIANO wanted Company A to employ.

A19. On or about March 28, 2016, SORIANO requested that PSC increase the ceiling on Company A's Task Order 1.

A20. On or about April 6, 2016, SORIANO emailed THURSTON, asking if Company A could bring Individual-2 "onboard." That same day THURSTON reached out to Individual-2 writing, "As I recall you are currently looking for employment? Or are you representing a firm?" On

13

or about May 2, 2016, Individual-2 was brought on board at Company A as a consultant.

A21. On or about May 17, 2016, SORIANO received an email from PSC asking for a meeting regarding Task Order 1. SORIANO forwarded the email to THURSTON commenting, "I guess we pushed the limit[.]" THURSTON replied, "That is what I heard. Think it is fixable?" SORIANO responded that he thought that certain projects "will be tough to defend."

A22. On or about August 18, 2016, THURSTON instructed another Company A employee to send SORIANO, who had recently had heart surgery, a fruit basket. The total cost of the fruit basket including taxes and fees was approximately $184.65. The message on the card stated that the basket was from "Russell Thurston, Vice President, Defense & Intelligence Solutions,[Company A]."

A23. On or about October 11, 2016, THURSTON emailed SORIANO procurement documents drafted by THURSTON and other Company A employees for an effort that they had nicknamed the Soriano 2.0 Task Order. The documents drafted by THURSTON and other Company A employees included an Acquisition Plan, Instructions to Offerors, an IGCE, and SOW. The documents purported to be for a competitive procurement on the CIO-SP3 GWAC.

A24. On or about January 6, 2017, THURSTON instructed Co-Conspirator-2 to tell SORIANO to release the upcoming competitive procurement prior to February 24, 2017 "as a [Service Disabled Veteran Owned Small Business]" procurement, and if the procurement was not released prior to February 24, then "we will need to put it in a other than small category."

A25. On or about January 24, 2017, THURSTON emailed Co-Conspirator-2 that he should bring a jacket for their upcoming trip to

San Diego, where they planned on meeting with SORIANO because "[w]e may go to dinner with a Senior SPAWARior."

A26. On or about January 26, 2017, THURSTON took SORIANO to lunch at Shino Sushi in San Diego. THURSTON expensed $72.19 to Company A for the meal.

A27. On or about January 27, 2017, Co-Conspirator-2 took SORIANO to lunch at Coasterra in San Diego, where they dined on "skinny" margaritas, a "mariscos ensalada" and "chicken pambazo" at a total cost of $88.25. Co-Conspirator-2 subsequently expensed the meal to Company A as a business meal.

A28. On or about February 9, 2017, SORIANO sent THURSTON a copy of Liberty Gutierrez's resume. THURSTON replied to SORIANO "I am thinking of calling the position a Senior Management Analyst. Using the attached PD for the position." THURSTON attached a position description for a Senior Management Analyst working for Company A in San Diego, CA.

A29. On or about February 9, 2017, after receiving Gutierrez's resume from SORIANO, THURSTON emailed Gutierrez, "I received your resume from Mr. Soriano in reference to a position we are looking to fill. If you are interested I would like to setup a time to discuss at your convenience." SORIANO forwarded the position description to Gutierrez. THURSTON wrote this email, despite the fact that there was no open position at the time, and no formal requisition had been drafted by Company A.

A30. On or about February 9, 2017, SORIANO instructed Gutierrez that Company A would "upload [the Position Description] and pull resumes" but that SORIANO would "select the candidates."

15

1    A31. On or about February 9, 2017, THURSTON emailed SORIANO
2  asking when he wanted Gutierrez to start at Company A.  SORIANO forwarded
3  the email to Gutierrez asking "When . . . "

4    A32. On or about February 13, 2017, THURSTON reached out to
5  SORIANO to see if he would agree to take over the development of a task
6  order, nicknamed C5ISR 2.0, THURSTON had been developing separately. On
7  or about February 15, 2017, SORIANO agreed.

8    A33. On or about February 26, 2017, THURSTON emailed SORIANO
9  asking him to get the status of the C5ISR 2.0 Task Order.   SORIANO
10  reported back that they were "Waiting for funds to get accepted before
11  any contract process can continue/proceed."   As THURSTON requested,
12  SORIANO subsequently emailed PSC and asked if the sponsor of the contract
13  could send funds to HHS.

14    A34. On or about February 27, 2017, Co-Conspirator-2 invited
15  SORIANO to dinner during an upcoming trip to Virginia Beach in March.
16  SORIANO suggested that they go out to the "Bahama Breeze" restaurant.

17    A35. On or about March 8, 2017, Co-Conspirator-2 took SORIANO
18  and another individual out to dinner at the Bahama Breeze restaurant in
19  Virginia Beach, VA.   Co-Conspirator-2 paid $85.86 for the meal, which
20  he expensed to Company A, as a business meal.

21    A36. On or about March 16, 2017, THURSTON instructed another
22  Company A employee to contact Liberty Gutierrez regarding the Program
23  Manager position because "We need to move forward on it and I have been
24  very slow with finalizing everything with Libby."

25    A37. On or about March 20, 2017, SORIANO reviewed the draft
26  documents for the C5ISR 2.0 procurement and indicated that the documents
27  were "Good to go . . . ."  The documents, approved by SORIANO, required
28  that the bidding contractor have an engineering and logistics facility

16

"within 25 miles of 1 Innovation Dr, Hanahan, SC 29410," even though the task order was supposed to be managed out of San Diego.

A38. On or about March 20, 2017, the same day SORIANO approved the C5ISR 2.0 procurement documents, THURSTON instructed another Company A employee to send Co-Conspirator-1 an exclusive "Teaming Agreement" for "NAVCENT IT and Communications Program Management Support Services" but instructed the employee to leave the SOW undefined "until the final RFP is released."

A39. On or about March 21, 2017, the day after SORIANO signed off on the competitive procurement documents for C5ISR 2.0, Company A officially offered Liberty Gutierrez a job as a Senior Management Analyst, starting April 3, 2017, earning approximately $77,000 per year, and working from San Diego. The company did so at THURSTON's direction, despite not having followed the company's typical hiring procedures. A few days later, on or about March 24, 2017, and as SORIANO and THURSTON intended, the official competitive RFP was released for the C5ISR 2.0 task order under number C-38521-DV only for companies in the "other than small" category on the GWAC.

A40. On or about April 3, 2017, THURSTON sent an email that "Jim and [other Government employee] from SSC-PAC recently visited our VA Beach office and liked the desks that you selected there. They are moving into a new office in Point Loma, CA and are going to do some updates. Can you work with them to put a furniture plan together? Both are Cc'ed." In a subsequent internal email about SORIANO's request for desks, THURSTON encouraged Co-Conspirator-2 and others to assist SORIANO and the other Government employee with their furniture selections because, "You really want to treat your customer that is putting in place a >$300M TO in place without a little love?"

17

1      A41. On or about April 14, 2017, Company A submitted its
2  proposal for RFP C-38521-DV.  Although THURSTON knew that Company A
3  employees had drafted the procurement documents, Company A affirmed in
4  the proposal that "our VP of Defense and Intelligence Solutions reviewed
5  the details of this TO for conflicts" and that the company was "not
6  aware of any actual or potential [Organizational Conflicts of Interest]
7  that might prevent ethical participation in the C5ISR [Task Order]." As
8  THURSTON intended, Company A was the only bidder on RFP C-38521-DV.

9      A42. On or about April 26, 2017, SORIANO submitted the
10  technical evaluation of Company A's proposal on RFP C-38521-DV to PSC.
11  According to the documents, SORIANO and another Government employee gave
12  Company A "Excellent" ratings and found no weaknesses or deficiencies
13  in their proposal.  SORIANO also signed a "Confidentiality Agreement and
14  Conflict of Interest Statement" in which he certified that he was "in
15  no way biased for or against any of the offerors" whose proposals he was
16  evaluating.

17      A43. On or about June 12, 2017, THURSTON took SORIANO out to
18  lunch at Rockin' Baja Lobster Coastal Cantina, in San Diego, California.
19  THURSTON paid $53.33 for the meal, which he expensed to Company A as
20  business development.

21      A44. On or about June 16, 2017, THURSTON emailed SORIANO
22  asking him, in reference to the C5ISR 2.0 Task Order, "Did you tell them
23  to award?"  On or about June 30, 2017, and as SORIANO had intended, PSC
24  awarded Company A Task Order 2, with a total potential value of
25  approximately $343,306,613.68.

26      A45. On or about July 25, 2017, Co-Conspirator-2 emailed
27  SORIANO, indicating that the company would need "additional funds" to
28  pay the various individuals employed at Company A at SORIANO's request.

18

A46. On or about August 8, 2017, in response to an email from a Navy employee to SORIANO asking him to fill out a form to allow the command to send money to SPAWAR to support a project in Bahrain, THURSTON instructed other Company A employees, "Jim is not going to do any forms. If it needs to be done then we need to do it."

A47. On or about that same date, SORIANO replied to the Navy employee regarding the Bahrain project, informing the employee that the employee could not send money to SPAWAR, SORIANO's employer. SORIANO followed up the next day instructing the Navy employee to contact PSC directly to send funding for the contracting effort. In response THURSTON forwarded SORIANO's email to other Company A employees with the comment, "I love this guy."

A48. On or about August 23, 2017, Co-Conspirator-2 emailed PSC seeking to confirm that certain work was going to be put on Task Order 2. Co-Conspirator-2 then forwarded the email string to SORIANO and Co-Conspirator-1 stating, "I was under the impression this work was coming our way. Is that not the case? Anything you can do to steer it back towards our contract?"

A49. On or about August 30, 2017, SORIANO forwarded Co-Conspirator-2 an email reflecting that money had been MIPR'd to PSC by the Navy Bureau of Medicine and Surgery ("BUMED"). Co-Conspirator-2 forwarded the email to various Company A employees including THURSTON. THURSTON replied, "We are in the Navy Medicine Health Records business now. I love this task order."

A50. On or about October 23, 2017, SORIANO emailed a SPAWAR colleague, asking him to sign the concurrence block of the COR appointment letter for Task Order 2 as SORIANO's supervisor. SORIANO

did so even though his actual supervisor was not on leave at the time, and was therefore available to sign the letter.

A51. On or about January 10, 2018, SORIANO attended a Company A holiday party and dinner for San Diego based employees at Coasterra Restaurant in San Diego, California. Company A paid approximately $116 for the pre-dinner social and approximately $521.67 for the dinner portion of the event. THURSTON approved the expense report for the event as the "Primary Supervisor" and "Project Manager."

A52. On or about January 26, 2018, Co-Conspirator-2 emailed SORIANO asking for his approval to use Task Order 2 for approximately $15 million worth of work with the Aviation, Missile, Research, Development and Engineering Center. SORIANO replied, "Ok Thanks." On or about that same date, THURSTON forwarded the email to Co-Conspirator-2 with the text, "Was that a yes?" Co-Conspirator-2 replied, "Sure[.]"

A53. On or about February 8, 2018, during the AFCEA West Conference, THURSTON took SORIANO and Co-Conspirator-1 out to dinner at Island Prime restaurant in San Diego, California. THURSTON paid approximately $764.80 for the meal, of which he expensed approximately $697.12 to Company A as a "Business Dinner." On his expense report, THURSTON falsely listed only himself as an attendee at the dinner.

A54. On or about February 9, 2018, SORIANO emailed THURSTON asking for Company A to employ Co-Conspirator-1 8-10 hours/week. THURSTON forwarded the email to Co-Conspirator-2 and another Company A employee with the text, "I think it is advantageous for us to keep [Co-Conspirator-1] on the payroll."

A55. On or about February 11, 2018, Co-Conspirator-1 wrote THURSTON about a potential new project, "Jim [SORIANO], directed me to

forward this to you. As you can see he has already given them [Company A] as the company to contract with and do the work."

A56.  On or about February 15, 2018, SORIANO forwarded THURSTON an internal Government email chain discussing how Company A had, but was not supposed to have, a detailed copy of the IGCE for a contracting effort.  THURSTON forwarded the email chain to various Company A employees with the text, "We need to tighten up the communications on the SPAWAR side."

A57.  On or about February 27, 2018, SORIANO texted THURSTON, warning him that PSC "is sensitive to [Company A] having copies of the MIPRS and MIPR numbers" and suggesting that SORIANO should "privately work the figures with [Co-Conspirator-2] and just keep his tracker in house instead of letting PSC have eyes on it."

A58.  On or about March 1, 2018, Co-Conspirator-2 emailed SORIANO and cc'd THURSTON and another Company A employee, inviting SORIANO to a "C5ISR contract review on Tuesday July 17th in Arlington, VA."  On or about March 2, 2018, SORIANO replied that "17 JUL is clear."

A59.  On or about March 20, 2018, Co-Conspirator-2 emailed SORIANO, and cc'd THURSTON and another Company A employee, asking SORIANO's permission to use Task Order 2 to support the U.S. Army Training and Doctrine Command.  On or about that same day SORIANO replied, "Yes, proceed with C5I coordination."

A60.  On or about that same day, THURSTON emailed Co-Conspirator-2 regarding SORIANO's quick approval with the text, "Insightful Analysis?"  Co-Conspirator-2 replied, "For sure.  He studied that document word by word. ☺"

A61.  On or about March 30, 2018, at THURSTON's request, Company A purchased four tickets to the 2018 Major League Baseball All

Star Game, which was scheduled for July 17, 2018 and Nationals Park in Washington, D.C. The tickets cost approximately $8,454.36. On or about that same date, THURSTON forwarded an email with the ticket details to Co-Conspirator-2.

A62. On or about April 5, 2018, Co-Conspirator-2 emailed SORIANO asking him about MIPR documents that he was supposed to receive from BUMED. Co-Conspirator-2 asked, "Have you received these from BUMED and can you approve so they can send to HHS?" SORIANO replied, "I received MIPRS this morning . . . . . all approved.

A63. On or about April 7, 2018, SORIANO emailed Co-Conspirator-2 a copy of the six procurement requests that BUMED sent him for his approval. He did so despite the express guidance from PSC that Company A should not receive a copy of MIPR documents or amounts.

A64. On or about June 1, 2018, SORIANO forwarded an internal Government email regarding a meeting with members of the United States Special Operations Command ("SOCOM") to THURSTON and Co-Conspirator-1. THURSTON forwarded the email to other Company A employees saying, "This is why we love Jim!"

A65. On or about June 5, 2018, THURSTON took SORIANO to dinner at Charley's Steak House in Tampa, Florida. THURSTON and SORIANO enjoyed two bottles of Caymus Napa wine ($210/bottle), and each enjoyed a Kobe Filet ($180/steak). They also dined on bacon scallops, cedar plank crab cakes, asparagus, and lobster mac and cheese. THURSTON paid approximately $1,088.43 for the meal of which he expensed approximately $908.43 to Company A as a "Meeting BD." On his expense report, THURSTON falsely claimed that he had taken "Michael Soriano" a "new hire" in Tampa to dinner, even though no such individual existed.

A66. On or about June 14, 2018, as a result of a "nudge" from THURSTON, SORIANO approved a project on Task Order 2 relating to the procuring and arming of vehicles for the White House Communications Agency ("WHCA").

A67. On or about that same date, SORIANO forwarded an email from PSC rejecting the WHCA project to Co-Conspirator-2 with the comment, "ok - - similar to procuring airplanes - NSA task."

A68. On or about June 18, 2018, SORIANO again approved Company A's project concept plan for the WHCA vehicle project on Task Order 2.

A69. On or about July 12, 2018, THURSTON texted SORIANO regarding the tickets to the 2018 MLB All Star Game, "Hey Jim. Would you be ok if I gave you the ticket to give to [Co-Conspirator-1's] son? I think it will be a better gesture from you than me." SORIANO replied, "no problem."

A70. On or about July 17, 2018, SORIANO attended the 2018 MLB All Star Game with Co-Conspirator-1, Co-Conspirator-2 and Co-Conspirator-1's son. On or about that same date, during the game, SORIANO texted THURSTON, "Great seats . . . . thank you!!!" THURSTON replied, "You are welcome."

A71. On or about that same date, SORIANO followed up with THURSTON about the WHCA project proposing, "WHCA…I think if we want to do it needs to be 8a to [other defense contractor] and team maybe with [Company A]."

A72. On or about July 18, 2018, THURSTON instructed another Company A employee to get into contact with an 8(a) company about the WHCA project and to "Reach out to them about the Sole Source for the vehicles. Less is more. Don't expand on anything more than we will want them to buy the vehicles from us and that all they need to do is push

23

1  the paper. I will get you a number for what they can have as a pass-
2  through."

3         A73. On or about July 24, 2018, SORIANO forwarded Co-
4  Conspirator-2 and THURSTON an email from PSC seeking guidance from
5  SORIANO about the WHCA project, with the text, "How should this [be]
6  structured?"

7         A74. On or about July 27, 2018, THURSTON sent ghost written
8  responses to SORIANO to questions posed by PSC about the WHCA project.

9         A75. On or about August 1, 2018, THURSTON texted SORIANO
10  "Checking in on WHCA." The next day, SORIANO texted back, "WHCA is
11  still direct award to [defense contractor]." THURSTON wrote back, "Cool.
12  We need to split the MIPR the[y] sent. Part goes on CIO SP3 and part
13  for the vehicles as a directed award."

14         A76. On or about August 16, 2018, SORIANO emailed THURSTON
15  with regard to the WHCA effort, "I am on the call with PSCHHS to ensure
16  funding is split out for C5I and direct award to [other defense
17  contractor]." On or about September 5, 2018, and as SORIANO and THURSTON
18  intended, PSC issued Modification 12 to Task Order 2, which included
19  approximately $1,756,097.57 for the communications piece of the WHCA
20  project. On or about September 14, 2018, and as SORIANO and THURSTON
21  intended, PSC awarded a sole source award to the other defense contractor
22  for the purpose of purchasing the vehicles for the WHCA project.

23         A77. On or about August 29, 2018, SORIANO sent an email to a
24  Company A employee, warning him that "NITAAC contract holders are
25  complaining that [Company A] is marketing the C5I task order to support
26  non-related IT efforts." ]

27         A78. On or about August 30, 2018, SORIANO passed along to
28  THURSTON, Co-Conspirator-2, and another Company A employee that he had

1  learned from HHS that the complaint about Task Order 2 originated with

2  contract holders supporting SOCOM.

3        A79. On or about September 21, 2018, SORIANO pushed back on a

4  BUMED representative who was seeking to report negative feedback

5  regarding Company A's performance on Task Order 2, "There are other +30

6  task orders with no issues.  It appears that this one task order is

7  being raised at the end of the [Period of Performance]."  On or about

8  September 24, 2018, SORIANO forwarded the entire internal Government

9  email chain to THURSTON.

10       A80. On or about October 18, 2018, after learning that PSC

11 would likely be shutting down Task Order 2, SORIANO told Co-Conspirator-

12 1 that THURSTON was going to develop the PWS and IGCE for a "Blanket

13 Purchase Agreement."

14       A81. On  or  about  October  19,  2018,  after  receiving

15 notification that PSC might be shutting down Task Order 2, THURSTON

16 emailed SORIANO, "Do you mind if I pay you a visit next week?"

17       A82. On or about October 24, 2018, while visiting SORIANO in

18 San Diego, THURSTON took SORIANO to dinner at the Grant Grill, inside

19 the U.S. Grant Hotel, in San Diego, California.  THURSTON spent

20 approximately $109.43 for the meal of which he expensed approximately

21 $89.43 to Company A as business development.

22       A83. On or about November 2, 2018, THURSTON sent SORIANO an

23 email from his personal email account to SORIANO's personal email account

24 with the subject "Use this email…."

25       A84. On or about November 5, 2018, SORIANO emailed PSC, asking

26 if he could submit a follow-on task order to UEN NC3 for $100,000,000.

27 After PSC wrote back in the affirmative, SORIANO forwarded the email

28

chain to THURSTON and Co-Conspirator-2, asking, "Can we borrow docs from C5I?"

A85. On or about November 6, 2018, SORIANO emailed THURSTON, Co-Conspirator-2 and cc'd Co-Conspirator-1, "Received…the go ahead from PSC HHS to develop the follow-on to CIO-SP3 UEN/NC3. Planning to use the 2014 PWS as a template……" That same date, Co-Conspirator-2 emailed SORIANO asking "Can you share that template? We may want to tweak it a bit." THURSTON followed up with SORIANO stating, "Jim, We will send you a cleaned up version this afternoon if you are okay with that."

A86. On or about November 7, 2018, THURSTON used his personal email account to email SORIANO at his personal email account a draft RFP, IGCE, Acquisition Plan, and PWS for a competitive procurement on the CIO-SP3 contract. In the text of the email, THURSTON offered to draft a DD-254 for the effort as well.

A87. On or about November 14, 2018, THURSTON texted Co-Conspirator-1, "Make sure [Co-Conspirator-2] buys you dinner tonight." Co-Conspirator-1 then texted SORIANO, "[Co-Conspirator-2] wants to have dinner with us[.] Russell wants him to pay[.] Is that ok[?]" SORIANO replied to Co-Conspirator-1, "Sure[.] We are so hungry[.]" Co-Conspirator-1 texted THURSTON back, "Jim just txt me and said everyone is hungry. So hope [Co-Conspirator-2's] got a high credit card limit[.] Hahaha[.]"

A88. On or about that same date Co-Conspirator-2 took SORIANO, another Government employee and Co-Conspirator-1 out to dinner at Gordon Biersch Brewery in Virginia Beach, Virginia, spending $109.26 on the meal. Co-Conspirator-2 expensed the meal to Company A as a business expense.

A89. On or about November 15, 2018, SORIANO emailed PSC asking for a Blanket Purchase Agreement ("BPA") example that he could use to support SOCOM and SPAWAR efforts. On or about that same date, Co-Conspirator-1 forwarded PSC's reply, attaching the examples, to THURSTON.

A90. On or about December 12, 2018, THURSTON used his personal email address to send the competitive procurement documents for the BPA, drafted by Company A employees, to SORIANO's personal email account with the text, "Attached the draft paperwork we discussed."

A91. On or about December 16, 2018, THURSTON resent the competitive procurement documents for the BPA to SORIANO's personal email account with the text "Had one minor error. All set now." SORIANO replied confirming that he had received the documents.

A92. On or about December 17, 2018, SORIANO forwarded the C5ISR BPA draft documents and the UEN draft documents that he had received from THURSTON from his personal email account to his Navy email account. A few days later, on or about December 20, 2018, SORIANO sent the procurement documents, drafted by THURSTON, to PSC.

A93. On or about January 10, 2019, SORIANO filed his required yearly OGE 450 form. On that form SORIANO failed to disclose the MLB All Star Game Tickets given to him by THURSTON.

A94. On or about February 13, 2019, two Company A employees took SORIANO and Liberty Gutierrez to dinner at Bencotto Italian Kitchen, in San Diego, California. One of the Company A employees spent $362.01 on dinner and drinks, which he expensed to Company A as a business development expense. THURSTON approved the expense report as the employee's "primary supervisor" and as a "project manager."

A95. On or about February 17, 2019, SORIANO used his personal email account to email THURSTON at his personal email account a timeline for the upcoming BUMED procurement, reflecting all of the proposed dates for Government action on the procurement.

A96. On or about February 19, 2019, THURSTON used his personal email address to send SORIANO, at his personal email address, draft procurement documents, including an IGCE and RFQ for a Global Operations Special Mission Solutions (GOSMS) competitive procurement on the General Services Administration Professional Services Schedule contract ("GSA PSS").

A97. On or about February 26, 2019, SORIANO forwarded to Co-Conspirator-1, who forwarded to THURSTON questions that PSC had received on the competitive BUMED solicitation.  On or about that same date, THURSTON wrote back, with recommended answers to the questions, which Co-Conspirator-1 then forwarded to SORIANO.

A98. On or about February 28, 2019, SORIANO sent the answers, drafted by THURSTON, to PSC, to answer their questions about the procurement.

A99. On or about March 5, 2019, THURSTON took SORIANO and several other individuals to dinner at Buca di Beppo in San Diego, California, at SORIANO's specific request.  THURSTON spent $201.05 on the meal, which he expensed to Company A as a business development expense.

A100.    On or about March 7, 2019, Co-Conspirator-2 emailed SORIANO procurement documents, drafted by Company A employees, for the Port Improvement Via Exigent Repair ("PIER") Joint Capability Technology Demonstration ("JCTD") effort.  The documents included a Justification and Approval ("J&A") Exception to Fair Opportunity, justifying sole

28

sourcing the effort to Company A, as well as an IGCE for the effort. In the text of the email to SORIANO, Co-Conspirator-2 wrote, "Attached are the documents you need for this sole source."

A101.    On or about March 7, 2019, SORIANO emailed PSC the IGCE and J&A drafted by Company A employees for the PIER JCTD effort, with the instruction "Docs submitted – sole source to [Company A]."

A102.    On or about March 14, 2019, SORIANO emailed THURSTON and other Company A employees informing them of the contracting strategy moving forward, and specifically that "PSC HHS will combine BUMED, CUS, SOCOM and others that were on the C5I into 1 BPA MAC, 5 years." SORIANO informed them that "It will take two months to set up award. Order will be on GSA PSS." SORIANO specifically asked the Company A employees for "help to provide a combined PWS/IGCE." THURSTON sent the email to several Company A employees instructing them, ""Smaller comms. Please let them know not to communicate this to anyone." THURSTON sent the email to another Company A employee with the instruction, "Mums the word to anybody. Internal and external. Roger?"

A103.    On or about March 21, 2019, THURSTON emailed PSC, regarding a contracting effort for BUMED, "it is my understanding that Mr. Soriano was working with BUMED to develop a SOW and supporting budget for the follow-on." On or about that same date, THURSTON emailed SORIANO the PWS and IGCE for the BUMED contracting effort, which had been developed by Company A, and not the Government customer, as represented by THURSTON.

A104.    On or about April 3, 2019, THURSTON emailed SORIANO, asking if PSC was putting in place a bridge contract for the PIER JCTD project and if the MIPR for the project had been accepted. On or about that same date Co-Conspirator-1 emailed THURSTON, "Jim said to pass to

you..    yes the mipr was accepted Jan 2019.  However, no PWS or IGCE has been received or seen."

A105.    On or about April 3, 2019, THURSTON emailed other Company A employees regarding the PIER JCTD bridge contract, "We need to develop a SOW and IGCE to get to Jim so he can send it to HHS."  On or about that same date, Co-Conspirator-2 emailed THURSTON attaching an IGCE, J&A and Statement of Objectives with the text, "See attached. These files were already sent to Jim Soriano previously."  THURSTON then forwarded the entire email chain, including the attached documents to SORIANO with the text, "Resending…"  The documents included a J&A, IGCE, and Statement of Objectives for the PIER JCTD effort.

A106.    On or about April 10, 2019, SORIANO signed the J&A for the PIER JCTD sole source contract to Company A and sent it to PSC.

A107.    On or about April 25, 2019, SORIANO completed the TEP for the Task Order for Company A for the PIER JCTD effort.  SORIANO was the only evaluator and rated Company A "Excellent."  On or about April 29, 2019, and as SORIANO intended, PSC awarded Company A a sole source contract for the PIER JCTD work, with a total potential award value of approximately $200,000.

A108.    On or about that same date, SORIANO emailed PSC telling them that he intended to do "7 more" direct awards to Company A.

A109.    On or about May 7, 2019, SORIANO texted Co-Conspirator-1, "Got a tip….my email is being monitored…[] With the amount of business….people are talking[.]"

A110.    On or about May 28, 2019, THURSTON used his personal email address to send SORIANO, at his personal email address, updated

procurement documents, including an RFP, PWS, and IGCE, for another BUMED effort.

A111.    On or about May 30, 2019, SORIANO emailed representatives at NITAAC the procurement documents to support the BUMED requirement, that had been sent to him by THURSTON.

A112.    On or about June 8, 2019, SORIANO emailed Co-Conspirator-2, and cc'd Co-Conspirator-1, THURSTON, another Company A employee, and representatives of CUS informing them, "PSC HHS will not accept funds, exercise options or process new orders.  It's chaos at PSC HHS.  I am working other avenues – NITAAC, GSA Region 9, GSA OASIS, NSWC Corona, DITCO and DOI."

A113.    On or about June 8, 2019, SORIANO texted THURSTON "I think my [Navy Marine Corps Intranet] mailbox is being monitored."

A114.    On or about June 18, 2019, four days after PSC indicated that they would no longer be handling assisted acquisitions, THURSTON emailed SORIANO, "We are going to need to let Libby [Gutierrez] go. Will it be impactful." Soriano replied, "Rgr[.]"  On or about that same date, THURSTON forwarded the email to another Company A employee with the instruction, "You can release her."

A115.    On or about June 25, 2019, SORIANO alerted THURSTON that he was having a meeting the next day regarding his contracting activity at NIWC and that "It is getting ugly as I am getting grilled with questions from my Department Head – Code 55.  i.e.. How does all these contracts relate my projects – CUS, NECC and HPC.  Are you being funded by these commands…….Well, I hope to survive tomorrow's  inquiry and not be placed on administrative leave."

A116.    On or about July 2, 2019, after learning that SORIANO was removed from his COR duties by SPAWAR, Co-Conspirator-2

emailed THURSTON, "Now that Jim Soriano is out of the picture do we still need [Co-Conspirator-1]?" THURSTON replied, "No. Let's let the dust settle." THURSTON followed up with the instruction, "I will need to do it. We will need to wait until after his trip and later in the month."

A117.   On or about September 13, 2019, SORIANO had a phone meeting with representatives at GSA regarding a bridge contract to Company A to support SOCOM. On or about September 16, 2019, following that call, SORIANO alerted THURSTON and another Company A employee that one of the procurement documents that had been submitted to GSA for the effort still had "a [Company A] personnel as author." SORIANO clarified that the document was an IGCE and stated "I am good with clearing properties."

A118.   On or about September 30, 2019, THURSTON emailed SORIANO about outstanding unpaid invoices on Task Order 2, with the text, "FYSA…We are getting close very close to having to take legal action."

A119.   On or about October 1, 2019, SORIANO texted THURSTON, "Can you send a list of unpaid invoices to my personal account...I have to prepare a status brief to the executives and the Admiral." On or about that same date, THURSTON emailed SORIANO's personal email address the list of Company A's unpaid invoices on Task Order 2.

A120.   On or about October 15, 2019, THURSTON took SORIANO, Co-Conspirator-2 and others out to lunch at Coasterra in San Diego, California. THURSTON paid $157.83 for the meal of which he expensed $137.83 to Company A as a business meal.

1       A121.    On or about October 29, 2019, after THURSTON learned
2 that DCIS was executing a search warrant at the Charleston office of
3 Company A, THURSTON instructed multiple employees to "[make sure you
4 route all communication back through our [Chief Legal Officer] [.]"
5 THURSTON did so even though he knew that the individual in question was
6 not an attorney, had no legal training, and in fact served primarily as
7 the head of contracting for the company.

## Count 2 – Bribery (JAMES SORIANO)
### (18 U.S.C. § 201(b)(2)(A) and (C))

23.  Paragraphs 1 through 22 of this Indictment are re-alleged and
incorporated by reference.

24.  Beginning in or before June 2014 and continuing through at
least October 2019, within the Southern District of California and
elsewhere, defendant JAMES SORIANO, a public official, engaged in a
course of conduct whereby he directly and indirectly, corruptly
demanded, sought, received, accepted, and agreed to receive and accept
things of value, personally and for other persons, including jobs for
friends and family, meals, and tickets to a premiere sporting event, in
return for being influenced in the performance of official acts and in
return for being induced to do and omit to do acts in violation of his
official duties, as opportunities arose.

All in violation of Title 18, United States Code, Section
201(b)(2)(A) and (C).

## Count 3 – Bribery (RUSSELL THURSTON)
### (18 U.S.C. § 201(b)(1)(A) and (C))

25.  Paragraphs 1 through 22 of this Indictment are re-alleged and
incorporated by reference.

26.  Beginning in or before June 2014 and continuing through at
least October 2019, within the Southern District of California and

elsewhere, defendant RUSSELL THURSTON engaged in a course of conduct whereby he directly and indirectly, corruptly, did give, offer, and promise things of value, as a stream of benefits, to a public official, personally and for other persons, including jobs for friends and family of the public official, meals, and tickets to a premiere sporting event, with the intent to influence the public official in the performance of his official acts and to induce the public official to do or omit to do acts in violation of lawful duties, as opportunities arose.

All in violation of 18 U.S.C. § 201(b)(1)(A) and (C).

### Counts 4-6 – Fraud and False Statement in Tax Return (JAMES SORIANO) (26 U.S.C. § 7206(1))

27.   Paragraphs 1 through 18 are hereby re-alleged and incorporated by reference.

28.   On the dates set forth below, within the Southern District of California, the defendant JAMES SORIANO, willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service, the following false U.S. Individual Income Tax Return, Forms 1040, for the calendar years set forth below, which were verified by a written declaration that there were made under the penalties of perjury and which defendant JAMES SORIANO did not believe to be true and correct as to every material matter. The tax returns underreported taxable income, whereas as defendant JAMES SORIANO then and there knew the items were false as set forth below:

//

//

//

//

//

| COUNT | TAX YEAR | APPROXIMATE FILING DATE | FALSE ITEM |
|---|---|---|---|
| 4 | 2017 | March 13, 2018 | a. Form 1040, Line 43, Taxable Income of $83,126. |
| 5 | 2018 | February 20, 2019 | a. Form 1040, Line 10, Taxable Income of $86,647. |
| 6 | 2019 | February 10, 2020 | a. Form 1040, Line 11b, Taxable Income of $112,525. |

in violation of 26 U.S.C. § 7206(1).

**FORFEITURE ALLEGATIONS**

29. The allegations set forth in Counts 1 through 3 of this Indictment are incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a) (1) (c), and Title 28, United States Code, Section 2461 (c).

30. Upon conviction of one and more of the offenses set forth in Counts 1 through 3, and pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), Defendants must forfeit to the United States any property, real and personal, which constitutes and is derived from proceeds traceable to the violations.

31. If any of the above-described forfeitable property, as a result of any act or omission of the defendants - (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States,

35

1 | pursuant to Title 28, United States Code, Section 2461(c) which
2 | incorporates the provisions of Title 21, United States Code, Section
3 | 853(p), to seek forfeiture of any other property of the defendants up
4 | to the value of the property described above as being subject to
5 | forfeiture.

6 |      DATED: February 27, 2024.

7 | A TRUE BILL:

8 |

9 |

10 | TARA K. MCGRATH
     United States Attorney
11 |

12 | By:
13 | MICHELLE L. WASSERMAN
     Assistant U.S. Attorney